UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH EID,

        Plaintiff,

                                        CASE NO. 06-12392
v.                                          HON. LAWRENCE P. ZATKOFF

SAINT-GOBAIN ABRASIVES, INC.,

        Defendant.

_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Detroit,
State of Michigan, on the 13th day of December, 2007.

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

       This matter is before the Court on Defendants' Motion for Summary Judgment (Docket #20).

Plaintiff filed a response, and Defendant has since replied.[1] The Court finds that the facts and legal

arguments pertinent to Defendant's Motion are adequately presented in the parties' papers, and the

decision process will not be aided by oral arguments. Therefore, pursuant to E.D. Mich. Local R.

7.1(e)(2), it is hereby ORDERED that Defendant's Motion be resolved on the briefs submitted,

without this Court entertaining oral arguments. For the reasons that follow, Defendants' Motion for

Summary Judgment is GRANTED IN PART and DENIED IN PART.

---

[1] Defendant's Ex-Parte Motion to Extend Page Limitation of Reply Brief (Docket #26) is
GRANTED.

## II. BACKGROUND

Plaintiff was born in Massachusetts in 1958, is a Lebanese-American (Arab-American) of Eastern Orthodox faith, and has a dark complexion. He was employed by Defendant (or its predecessor, Norton Company) from November 9, 1981, until September 6, 2005. For the last 10 years of his employment, he was a Senior Account Manager, and he was subject to a Performance Appraisal Review ("PAR") each year.

For calendar years 2002 and 2003, his PAR was completed by his supervisor, Keith Jahn ("Jahn"), and his overall performance score for each those two years was less than 3 on a scale of 1 to 5 (with 1 meaning "Improve"; 3 meaning "Effective"; and 5 meaning "Outstanding"). Plaintiff received a "2+" rating (needs improvement) for 2002, during which time his sales decreased 26.91% from 2001 (his goal was a 1% increase over 2001). He received a rating of 1 for his sales because he was "not meeting his targets and goal." Jahn commented in Plaintiff's 2002 PAR that Plaintiff "continue[d] to be slow in getting paperwork and verbal responses taken care of in a timely manner." Jahn further stated that

> Ken is a very hard working sales guy, very activity oriented, but I question his effectiveness at times. I feel he must develop a territory game plan for success and work the plan. He must stay focused! Ken's big problem is that he gets involved in ten different projects at once and accomplishments are few.

In 2003, Plaintiff's goal was to increase his overall sales by 2.5% over his 2002 sales. Plaintiff did not meet this goal, as his sales were down 2.3%. Jahn's review indicated that Plaintiff made moderate improvement in responsiveness to both verbal and written requests, but his overall PAR score was still a "2+." Plaintiff received a rating of 2 for his sales ("meeting some targets, falling short on some; overall goal not being met"). In Plaintiff's 2003 PAR, Jahn commented:

> I have been very challenged in managing Ken Eid like no other in my sales management career. We have made some progress in 2003 but it has not been easy. In my mind improvement is still necessary. After facilitating a rather negative PAR for 2002 results in Feb. of 2003, I thought Kenny would have responded. I thought I got his attention. However, nothing changed until "I" scheduled a mid-year review. Only after that session was Ken willing to start to take me seriously (see his August 25th territory plan). Again, some progress was made but not enough to move his overall rating to

2

a three.

(emphasis in original).

For calendar year 2004, Plaintiff's new supervisor, Pat Parker ("Parker"), prepared Plaintiff's PAR. In calendar year 2004, Plaintiff's sales dropped .4%, and he received an overall performance score of "2+," which meant "Improvement Needed" on Defendant's revised PAR form. Plaintiff again received a rating of 2 (improvement needed) for his sales. Parker commented:

> Ken is a very hard worker, but not very effective. He spends a great deal of time on the fine detail but does not get the task completed. He gets involved in too many projects and completes few that he begins. Ken must get better organized in his territory to become efficient and responsive to the customers needs.

> This job has changed a great deal in the past 5 years and the salespeople need to control the destiny of our growth. We can not rely on our distributors to do the work for us. I have seen where Ken still wants the distributor to manage the business for him. Ken has to have the customer think of him as Saint Gobain Abrasives to ensure that our products are the first choice.

> Ken has 3 years of consecutive poor performance in sales. 2004 -.4%; 2003 -2.3%; 2002 -26.9%. This is not what I would expect from a Senior Account Manager who has been in Michigan for over 20 years.

On February 23, 2005, Plaintiff met with Parker to discuss Plaintiff's 2004 PAR. Kip Paterson ("Paterson"), Defendant's Director of Human Resources, was present at that meeting as well, as Parker had asked Paterson to attend. At the meeting, Plaintiff was informed that he was being placed on a Performance Improvement Plan ("PIP"). The PIP contained conditions Plaintiff had to satisfy, and Plaintiff signed the PIP below a notation that said "I [Kenneth Eid] understand that if I fail to satisfy any of the conditions listed above, I will be terminated."

At the meeting with Parker and Paterson on February 23, 2005, Plaintiff complained to Paterson that Parker had made discriminatory statements to Plaintiff and had made discriminatory statements about Plaintiff while Plaintiff was present. This was the first time Plaintiff complained to any "management" of Defendant about issues of discrimination (it is unclear whether, and when, Plaintiff may have voiced similar complaints with fellow sales persons). Although the depth of what

3

Plaintiff told Paterson on February 23, 2005, is unclear, Plaintiff alleged that Parker discriminated against him in the following ways (these descriptions reflect the words of Plaintiff at his deposition):

1.	At a regional sales meeting at the end of the first quarter or beginning of the second quarter in 2004, Ron Gustafson ("Gustafson"), another sales representative for Defendant (*i.e.*, a co-worker of Plaintiff's), made a comment (in a manner that "might have been" joking) to the effect that Plaintiff could "not get[ ] through airport security or something because of my ethnic background" and then Parker said:

	". . . that's fair warning-fair warning to-something to the effect that, stay away-to stay away from Ken. You know, don't take Ken to an airport or stay away from Ken at airports."

2.	At a sales meeting in the Lansing area in the summer of 2004,

	". . . Mr. Ron Gustafson, make a comment about me being at a - his recollection of me being at a baseball game opening day at Tiger Stadium some years back and me getting frisked at the gate for possible beer or something like that - I do recollect that comment. And that's when Mr. Parker made a comment about keeping his distance from me - people keeping their distance from me at places where security - airports and whatnot."

3.	During a telephone call between Parker and Plaintiff,

	"There was a phone conversation I was on with Mr. Parker, and in response to a comment I made - specific comment was regarding something to do with business, how to handle something. I made the comment that you don't have to go to Yale to figure that out, regarding a distributor or whatever. It was a jestful comment. Mr. Parker proceeded to respond to that comment by saying, oh, Yale? Well, that's not - the college Yale is not for people like me, it's for people like you. And that - he made the comment that - in that part of the conversation, that - I asked him, I said, what do you mean by that? And he responded by saying, white American males like me can't get into colleges or institutions like that because of minorities like you."

4.	At a meeting at E & R Industrial Sales Company ("E & R") on December 2, 2004, one of Defendant's customers, when Plaintiff, Parker, Gustafson, Jeff Clark ("Clark"), Larry Edison and "perhaps Paul Thome" (all of whom are employees of Defendant) were present:

	"Well, I specifically recall, prior to the meeting getting started, we were on the second floor at E & R Industrial Sales in a meeting room and conversation amongst the three or four of the guys was relative to - specifically related to the Bin Laden family's departure from this country and how it was handled - and the manner in which it was handled by the Bush administration, and from one of the comments that I can remember - prior to Mr. Parker making the comment he made, I had stated the fact that it was almost alarming or - I don't know how - it was discouraging how the manner in which the Bush administration - how they were escorted, basically - I think I used the term carpeted out of the country. And following that comment from me, Mr. Parker looked at me and stated, 'well, Ken, if I had it my way,

4

I'd deport every Arab out of this country. What do you think of that?'"

There are no allegations that Parker made any additional discriminatory remarks about or to Plaintiff subsequent to the February 23, 2005, meeting and prior to his termination. During that time, Plaintiff had three reviews in relation to the PIP, the last of which was held on July 27, 2005. As of July 27, 2005, Plaintiff was satisfying five of the six goals set forth in the PIP; he was not attaining the goal for target account sales. Plaintiff and Parker were the only participants at the July 27, 2005, PIP review, and Parker terminated that PIP review because he believed there came a point when Plaintiff was focused only on rehashing old issues. During the meeting, Plaintiff requested a conference with Paterson and Defendant's National Sales Manager, David Dodd ("Dodd"), and Parker contacted Paterson to set up that meeting. On August 10, 2005, Plaintiff participated on a telephone conference call with Paterson and Dodd, and Plaintiff discussed his performance and his issues with Parker. In the course of that telephone conference, Dodd told Plaintiff that Plaintiff needed to reach out to Parker and find a way to work with Parker. The following day, Paterson sent Plaintiff an email reminding him of his need to contact Parker and work things out. Plaintiff never contacted Parker after receiving the directive from Dodd or the email from Paterson. On September 6, 2005, Defendant terminated Plaintiff.

### III. LEGAL STANDARD

Summary judgment is appropriate only if the answers to the interrogatories, depositions, admissions, and pleadings, combined with any affidavits in support show that no genuine issue as to any material fact remains and that the moving party is entitled to a judgment as a matter of law. *See* FED. R. CIV. P. 56(c). A genuine issue of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)(citations omitted). In application of this summary judgment standard, the Court must view all materials supplied, including all pleadings, in the light most favorable to the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324. The nonmoving party must do more than show that there is some metaphysical doubt as to the material facts. It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment. *See Moore v. Phillip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

## IV.  ANALYSIS

### A.    Discrimination Claims

Plaintiff asserts seven discrimination claims:

(1)     Count I - ethnic discrimination pursuant to 42 U.S.C. § 1981;

(2)     Count II - race discrimination pursuant to Title VII, 42 U.S.C. § 2000e-2(a)(1);

(3)     Count III - race discrimination under the Michigan Elliot-Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2202(1)(A);

(4)     Count IV - national origin discrimination pursuant to Title VII, 42 U.S.C. § 2000e(2)(a)(1);

(5)     Count V - national origin discrimination pursuant to ELCRA, M.C.L. § 37.2202;

(6)     Count IX - age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623; and

(7)     Count X - age discrimination under ELCRA, M.C.L. § 37.2202.

### 1.    Standard for Discrimination Claims

In deciding a motion for summary judgment, all of Plaintiff's discrimination claims are to

be evaluated under the same standard. *See Jacklyn v. Schering-Plough Healthcare Prod. Sales Corp.*, 176 F.3d 921, 928-29 (6th Cir. 1999); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) ("[t]he *McDonnell-Douglas/Burdine*[2] formula is the evidentiary framework applicable not only to claims brought under Title VII, but also to claims under ADEA, . . . and to claims under 42 U.S.C. § 1981, . . ."); *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462-63 (2001) ("Although originally created for use in race discrimination claims, we have adopted the *McDonnell-Douglas* approach for use in age . . . discrimination cases brought under the Michigan Civil Rights Act [ELCRA] as well."); *Lytle v. Malady*, 456 Mich. 1, 27 (1997) (internal citations omitted) ( "[W]e have looked to *McDonnell-Douglas* and its progeny for guidance when addressing the Civil Rights Act [ELCRA]"); *Ahmed v. Visteon Auto. Systems, et al.*, 2004 WL 2601206 (Mich. App.) (ethnic discrimination claim under ELCRA proceeds through the steps set forth in *McDonnell-Douglas*).

It is the plaintiff's burden to establish a prima facie case of discrimination, and a plaintiff must establish discriminatory animus was a motivating factor in the employer's action. *Jacklyn*, 176 F.3d at 926. A claim of discrimination can be established either by direct evidence of discrimination or circumstantial evidence creating an inference of discrimination. *Id.; Sniecinski v. BCBSM*, 469 Mich. 124, 132 (2003). In this case, Plaintiff argues that there is both direct evidence of discrimination and indirect evidence of discrimination such that Defendant's motion for summary judgment should be denied.

### 2. Direct Evidence

Direct evidence of discrimination is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *See Jacklyn*, 176 F.3d at 926 (citations omitted); *Sniecinski*, 469 Mich. at 133 (quoting *Hazle*, 464 Mich. at 462).

> [Direct evidence] does not require the fact finder to draw any inferences to reach that conclusion. . . . For example, proof of "a

---

[2]*McDonnell-Douglas v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248 (1981).

> facially discriminatory employment policy or a corporate decision maker's express statement of a desire to [avoid hiring] employees in the protected group is evidence of discriminatory intent." . . . Evidence of discrimination is not considered direct evidence unless a racial motivation is explicitly expressed.

*Amini v. Oberlin College*, 440 F.3d, 359 (6th Cir. 2006) (citations omitted).

In his brief, Plaintiff does not explicitly direct the Court's attention to any particular statement made by Parker (or any other decision maker at Defendant) which constitutes direct evidence of age, race or ethnic discrimination. At most, Plaintiff states that "repeated statements were made by the decision-maker, Parker, throughout the first year of his managerial employment relationship with Plaintiff." After reviewing the record in this case, the Court finds that there are no allegedly discriminatory statements made by Parker (or any other decision maker of Defendant) except those set forth in Section II above. The Court finds, as a matter of law, that none of the statements set forth above constitutes direct evidence of discrimination by Defendant. Plaintiff also fails to direct the Court to any policy of Defendant, and the Court's scouring of the record uncovered no policy of Defendant, that expressed a desire by Defendant to avoid hiring persons in any of the protected classes to which Plaintiff claims to belong. To the contrary, the very first paragraph of Defendant's Employee Handbook expressly states that the Company will not discriminate on any prohibited basis, including age, ancestry (ethnicity) or race. Finally, the Court did not locate any policy of Defendant that (even implicitly) suggests that persons in a protected class are to be terminated.

Accordingly, the Court concludes that Plaintiff has not offered any direct evidence that Defendant sought to terminate (or refused to hire) persons who belonged to any of the protected classes to which Plaintiff claims to belong.

> 3.    *Circumstantial Evidence*

In the absence of direct evidence of discrimination, a plaintiff must proceed through the steps set forth in *McDonnell-Douglas v. Green*, 411 U.S. 792, 802 (1973). Under *McDonnell-Douglas*, a plaintiff can proceed upon presenting evidence from which a factfinder could infer that

the plaintiff was the victim of unlawful discrimination. *See Hazle*, 464 Mich. at 462; *DeBrow v. Century 21 Great Lakes, Inc. (on reh.)*, 463 Mich. 534, 537-38 (2001). Under this circumstantial evidence approach, a plaintiff can establish a *prima facie* case of discrimination by showing that:

(1) he was a member of a protected class;
(2) he suffered an adverse employment action;
(3) he was qualified for the position; and
(4) he was treated differently from similarly situated persons outside the protected class.

*See, e.g., Anthony v. BTR Auto. Seal. Syst.*, 339 F.3d 506, 515 (6th Cir. 2003); *Jacklyn,* 176 F.3d at 928. *See also Reeves v. Sanderson Plumb. Prod., Inc.,* 530 U.S. 133, 143 (2000).

"The establishment of a *prima facie* case creates a rebuttable presumption of discrimination and requires [the employer] to articulate some legitimate, nondiscriminatory reason for taking the challenged action." *Anthony*, 339 F.3d at 515. "If the defendant can respond with such a reason for the adverse employment action, the plaintiff has the burden of offering evidence that the defendant's justification is a pretext that masks its true discriminatory intent." *Amini*, 440 F.3d at 359-60; *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003) (en banc). A plaintiff may establish pretext "by showing that the [defendant's] proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Wexler*, 317 F.3d at 576 (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

4.      *Race and Ethnicity Claims*

a.      **Prima Facie Case**

Plaintiff's claims of race and ethnic discrimination are based on his status as a Lebanese-American (Arab-American). There is no dispute that Plaintiff satisfied the first two prongs of the four-part *prima facie* showing required under *McDonnell-Douglas* and its progeny. Plaintiff was a member of a protected class (Arab-American), and he suffered an adverse employment action (involuntary discharge). Defendant protests, however, that Plaintiff cannot satisfy the third prong (qualified for the position) or fourth prong (being treated differently than similarly situated persons

not in the protected class) under *McDonnell-Douglas* and its progeny.  The Court disagrees.

There is evidence in the record that Plaintiff was qualified for his position as Senior Account Manager.  He had been promoted to the position in 1995 and worked there for over 10 years.  For purposes of assessing whether Plaintiff was qualified for his position, it is irrelevant if Plaintiff (1) had a sub-par performance in the latter years of his employment, or (2) was terminated. *See, e.g., Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000) ("when assessing whether a plaintiff has met her employer's legitimate expectations at the *prima facie* stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff").  Under the *McDonnell-Douglas* doctrine, the issue of Plaintiff's alleged sub-par performance is to be considered by the district court at the third stage, when the district court's role is to decide the "ultimate question" of discrimination. *Id.* at 660.

The Court also finds that Plaintiff has set forth evidence that he was treated differently than similarly situated persons who were not of his race and ethnicity.  Although there is evidence that a number of persons were identified at times by their ethnicity (*e.g.*, Gustafson was "the Swede" and Dan VanHamlin ("VanHamlin") was "the Dutch guy"), this is not a case where Plaintiff similarly was nicknamed on the basis of his surname.  In addition, there is no indication that "the Swede" and "the Dutch guy" comments were made or received in a manner that offended anyone.  Here, several of Defendant's employees stated that Parker made a number of remarks that went beyond referring to Plaintiff based on the nationality of his surname or in a manner that was funny or taken well by Plaintiff.  For example,

> (a)    VanHamlin stated that Parker joked around a couple of times, talking about "Kenny's people or cousins or whatever over in the Middle East . . . I seem to recall Pat saying something about 9/11 were relatives of Kenny's or his people or something like that, making a joke about it or whatever, but it really wasn't very funny, . . .";

> (b)    Clark testified that Parker said "something to the effect of sending Arabs back to the Middle East, . . ."; and

(c)     VanHamlin said that Parker "has joked around a couple times, meaning something about Kenny's people or cousins or whatever over in the Middle East, and in a joking manner."

Likewise, on December 8, 2005, when Paterson interviewed the Defendant's representatives who were present at the December 2, 2004, meeting at E&R, Paterson's notes of his conversation with Parker state:

> Arab Nation meeting @ Detroit Airport causing traffic problems. Radio news story about the Arabs complaining about the roads + traffic in Detroit.  Small talk at beginning of meeting + topics of the Arab Nation meeting came up.  If Arabs not happy about Detroit they can go back to Middle East. Said in jest.  Does not remember Ken taking offense to it.  Jeff Clark was there.  Not sure who else may have been in the room but thinks Ron Gustafson, VanHamlin, Pete Brown.

Though Parker denied saying that "white American males like me can't get into colleges like Yale because of minorities like you" when he testified at his deposition, a letter from Defendant's corporation counsel to Plaintiff's attorney states that Parker admitted saying that "White guys were going to be the minority with no affirmative action programs going forward."  In the same letter from Defendant's corporation counsel, Parker acknowledged that there were situations where sales personnel discussed "heightened airline security measures where some comments were made that Ken would likely face additional scrutiny because of his "*swarthy* complection" (emphasis added). The use of the word "swarthy" itself is open to multiple interpretations, not all of which are positive or even neutral.

The four incidents set forth in Section II. echo the statements of Clark and VanHamlin. Those incidents also describe additional episodes which involved race or ethnicity based comments that objectively could have been (and Plaintiff indicates were) perceived as offensive.  As Clark indicated, and as Dodd acknowledged, statements to an Arab-American that he creates problems at airports because of his ethnicity or appearance are not funny.  More significantly, such statements constitute evidence that Plaintiff was treated differently than similarly situated persons who were

not of his race and ethnicity. Accordingly, the Court concludes that Plaintiff has established a *prima facie* case of race and ethnic discrimination.

### b.    Legitimate, Nondiscriminatory Reason

Defendant offers two legitimate, nondiscriminatory reasons for Plaintiff's termination: (1) Plaintiff was not performing satisfactorily, and (2) Plaintiff did not follow orders from his superiors. An abundance of undisputed evidence supports those reasons. First, for the last three full years prior to his termination, Plaintiff failed to achieve a rating above "2+" on a five point scale. Second, Plaintiff did not meet his sales goals in 2002, 2003 or 2004, eventually resulting in the development of the PIP. Third, Plaintiff did not fulfill all of the requirements set forth in his PIP. As Plaintiff acknowledged in signing the PIP in February 2005, the failure to fulfill all of the requirements would result in his dismissal. Fourth, Plaintiff did not follow direct orders of his supervisors, including Dodd and Paterson. For example, during the telephone conference between Plaintiff, Paterson and Dodd on August 10, 2005, Dodd told Plaintiff that it was Plaintiff's responsibility to work things out with Parker and directed Plaintiff to call Parker. Despite a reminder e-mail from Paterson the next day, Plaintiff never contacted Parker before his termination almost a month later. Accordingly, the Court finds that Defendant has met its burden of articulating a legitimate, nondiscriminatory reason for Plaintiff's discharge.

### c.    Pretext

Plaintiff has three available methods to show that Defendant's explanation for discharging him was pretextual. Plaintiff could show that: (1) Defendant's proffered reason had no basis in fact; (2) Defendant's proffered reasons did not actually motivate Defendant to terminate him; or (3) the reasons given were insufficient. *Dubey v. Stroh Brewery Co.*, 185 Mich.App. 561, 565-566 (1990); *Dews,* 231 F.2d at 1021; *Feick v. Monroe Co.*, 229 Mich.App. 335, 343; 582 N.W.2d 207, 212 (1998). "An employer's business judgment . . . is not an absolute defense to unlawful discrimination." *Id. See also Nawrot v. CPC Int'l*, 277 F.3d 896, 906 (7th Cir. 2002) ("we need not

abandon good reason and common sense in assessing an employer's actions"). "Where an adverse employment decision could have been based on both legitimate and legally impermissible reasons, a plaintiff must prove that the defendant's discriminatory animus was more likely than not a substantial or motivating factor in the decision." *Sniecinski*, *supra*, at 133 (citations omitted); *Knox v. Neaton Auto Products Mfg., Inc.*, 2004 WL 1543156, at *3 (6th Cir. 2004); *Matras v. Amoco Oil Co.,* 424 Mich. 675, 682 (1986) ("A jury can find that the discharge was 'because of age' even if age was not the sole factor").

A plaintiff can establish pretext by means of indirect evidence "by showing that the employer's proffered explanation is unworthy of credence." *Jenkins v. Southeastern Michigan Chapter, American Red Cross*, 141 Mich App 785, 794 (1985) (citations omitted). In *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)(footnote omitted)(emphasis in original), the United States Supreme Court addressed the matter of credence and the issue of finding pretext in the context of employer discrimination:

> The fact-finder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection, [n]o additional proof of discrimination is *required ....*

In responding to a motion for summary judgment, a plaintiff does not have to prove the pretext by a preponderance of the evidence, but need "only create a question of material fact upon which reasonable minds could differ regarding whether discrimination was a motivating factor in the employer's decision." *Hazle*, 464 Mich. at 466.

Plaintiff argues that the *Wexler* case is the most analogous to his situation. Although the *Wexler* case involved an age discrimination claim, a manager's expression of stigmatizing beliefs about a protected class was sufficient to constitute evidence of illegal motivation in the manager's

decision to demote. In addition, an analysis of the plaintiff's proofs regarding his performance, as measured by sales statistics, was significant:

> [Wexler] pointed to evidence showing that the management of White's knew that the company's advertising strategy had hurt sales throughout the chain, including a decrease in sales at the Morris Road store. If believed, a trier of fact could reasonably infer that the justification for Wexler's demotion was insufficient to warrant the adverse decision. When combined with the age-related statements of [decision-makers], a reasonable factfinder could infer that impermissible considerations tainted their assessment of Wexler s performance as a store manager. Finally, Wexler put forth evidence that a subsequent, much younger manager was retained despite similarly dismal profits. The company's willingness to retain the younger manager in the face of declining sales calls into question [the decision maker's] voracity when he claimed that he would have retained Wexler but for the revenue problems. The retention of the younger manager as Wexler's replacement-once-removed thus undermines the explanation that store revenue is critical to a store manager's job security. This is an inference that must be drawn, at summary judgment, in favor of the nonmovant.

*Id.* at 577-78.

Plaintiff relies on numerous actions of Defendant as evidence that Defendant's proffered reasons were pretextual. First, Plaintiff argues that the prejudicial statements of Parker described above exemplify that the discharge was discriminatory. Second, Plaintiff asserts that comments Parker made regarding Plaintiff's religion, when taken in conjunction with Parker's other comments, demonstrated ethnic animus. Such comments consisted of a statement by Parker that "Arabs can't be Catholics" and an attempt to suggest that Plaintiff and Parker had religious similarities. Third, Plaintiff contends that Parker's notes about Plaintiff's alleged failures on behalf of clients or poor relationships with clients were not accurate, as evidenced by the deposition testimony of such clients. For example, John Ireland, a Tartan Tool representative, testified that he had never made any negative statements about Plaintiff to Parker. At his deposition, John Ireland testified that he made positive comments to Parker about Plaintiff. Jerry Pizzimenti, the President of E & R, testified that he had no discussions with Parker regarding Plaintiff and testified that "I never had a problem with Kenny not doing what he's supposed to do for us." Plaintiff also claims that Parker's alleged

concerns about customer satisfaction were not disclosed to him prior to his termination, including at any PIP evaluation or meeting.

Fourth, Plaintiff asserts that sales for the Defendant's business as a whole were in decline in the years 2002-2005, yet other persons who had poor sales were not put on PIPs or discharged. Specifically, Plaintiff points to Paul Thome ("Thome"), a fellow salesman who received a promotion at the end of 2005, even though his sales were down 39.09% from his goal through August 2005. Plaintiff also argues that his sales for 2004 and 2005 were better than most of the other salespeople in his district. Plaintiff claims that the region he worked in during 2003 was down 2.46% from the prior year, yet he was only down 2.38% compared to his prior year.

Fifth, Plaintiff contends that Defendant's claim that he failed to satisfy the PIP is hollow. The parties agree that Plaintiff did not satisfy a PIP requirement regarding his target account quotas. Plaintiff argues, however, that the Defendant did not use target accounts as an incentive for salesman in its bonus program, a belief Clark and Thome also expressed in their depositions. Plaintiff argues that no one in his district "was selling anywhere close to the TARGET ACCOUNT QUOTAS" (capitals in original). In fact, Parker acknowledged, and Defendant's charts show, that in Plaintiff's region, the regional target account goals for 2005 ended up at 29.53% against an actual goal of 60%. In addition, Parker allegedly provided Dodd and Paterson with the wrong information for Plaintiff on August 9, 2005, when Parker reported "Reviewed Target accounts. 13% YTD versus 35% YTD target. Five projects have no sales activity." Plaintiff's target as of the July 27, 2007, PIP review actually was 30%, not 35%. At the same time, regional target activity was 22.97% against an actual goal of 35%, information Parker allegedly did not share with Dodd and Paterson. There is also evidence that Parker measured his salespeople by sales growth, as he stated in a memo to Dodd and Paterson dated August 9, 2005. Assuming these things were true, a reasonable person could interpret the foregoing facts as demonstrating that Defendant held Plaintiff to a higher standard than other sales persons who reported to Parker, all of whom were white.

15

Sixth, Plaintiff maintains that the sales figures computed by Parker in his 2004 PAR were erroneous and that his ratings should have been higher. As a result, Plaintiff prepared a written rebuttal, including spreadsheets, to document where Parker's numbers were wrong. Parker acknowledges that he did not review Plaintiff's rebuttal. Plaintiff argues that Parker's refusal to review the rebuttal prepared by Plaintiff demonstrates the animus Parker held against Plaintiff. Seventh, Plaintiff notes that Defendant has a lack of diversity in its workplace, with only one African-American and no Arab-Americans (since Plaintiff was terminated) among the 124 sales persons reporting to Dodd.

Finally, Plaintiff argues that Defendant, namely Paterson, never investigated Plaintiff's claims of discriminatory remarks by Parker. Paterson has testified that no investigation was conducted because Plaintiff did not provide information upon which Defendant could conduct such an investigation, including failing to provide Paterson with names and phone numbers of witnesses. It is unclear whether Plaintiff actually provided Paterson with that information, but it is clear that Paterson had that information within days of the February 23, 2005, meeting. Plaintiff specifically stated that Parker was the person who made the discriminatory remarks and that Plaintiff's peers were at the December 2, 2004, meeting at E & R. In an email the following day, Parker himself emailed Paterson that the attendees of the December 2, 2004, meeting at E & R were "Jerry Pizzimenti, President of E & R Industrial, Ken, Eid, Sr. Account Manager, SGA, Jeff Clark, Account Manager, SGA, Peter Brewer, Territory Manager, SGA, Larry Eidson, Account Manager, SGA; Dan VanHamlin, Account Manager, SGA." Despite this information, Paterson states that while Plaintiff was employed by Defendant, he never questioned Parker or other relevant employees regarding Plaintiff's allegations.

Defendant offers many arguments to dispute the foregoing pretext contentions of Plaintiff, however, such arguments are not adequate to warrant the granting of its motion for summary judgment. In a summary judgment motion, all inferences must be viewed in Plaintiff's favor, *Matsushita, supra,* and it is for the fact finder to determine which position to believe. Accordingly,

based on the matters discussed above, the Court concludes that Plaintiff has "create[d] a question of material fact upon which reasonable minds could differ regarding whether the discrimination was a motivating factor in [Defendant's] decision" to terminate Plaintiff. *Hazle, supra.* In other words, the Court finds that Plaintiff has met its burden of producing evidence that Defendant's basis for terminating him was pretextual.

### d. <u>Conclusion</u>

For the reasons set forth in this Section IV.A.4, the Court DENIES Defendant's Motion for Summary Judgment as it relates to Counts I -V.

### 5. *Age Discrimination Claims*

In his response brief, the only time Plaintiff discussed the issue of age discrimination was in the context of the *Wexler* case. As set forth above, that discussion was for the purpose of demonstrating that stigmatizing beliefs could be probative of illegal motivation in a decision to demote. With respect to this case, however, Plaintiff did not discuss any "facts" which were probative of an age-based discrimination claim. At his deposition, Plaintiff was asked if he ever heard anyone make any kind of negative reference to his age while employed by Defendant. Plaintiff responded, "Perhaps, yes. . . . in one of Keith John's [sic] evaluations . . . he made reference to the fact that he wanted the old Ken back[.]" Plaintiff stated he could not recall anything else that could have referenced his age.

The Court is not persuaded that Jahn's comment could be construed as discriminatory. Significantly, Jahn said he wanted the "old Ken" back; Jahn did not say he wanted the "younger" or "young" Ken back. Moreover, Jahn's statement clearly was in relation to Plaintiff's past performance, not Plaintiff's age, as exhibited by Jahn's comment in the 2002 PAR: "In my mind it is critical that Ken re-evaluate his work habits and bring back the Ken from years past." Between Plaintiff's qualified answer at the deposition and the absence of argument in his response brief, Plaintiff essentially concedes the lack of merit on the age discrimination claims. Accordingly, the

Court GRANTS Defendant's motion with respect to Counts IX and X (Age Discrimination pursuant to the ADEA and ELCRA, respectively).

**B.    Retaliation Claims**

Plaintiff asserts three retaliation claims: (1) Count VI - retaliation for complaints of race discrimination pursuant to 42 U.S.C. §1981; (2) Count VII - retaliation for complaints of race discrimination pursuant to Title VII, 42 U.S.C. § 2000e-3(a); and (3) Count VIII - retaliation for complaints of race discrimination under ELCRA, M.C.L. § 37.2701(a).  In order to establish a claim of retaliation under 42 U.S.C. §1981, Title VII and ELCRA:

> A plaintiff must now prove that: (1) [he] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. . . . If and when a plaintiff has established a *prima facie* case, the burden of production of evidence shifts to the employer to "articulate some legitimate, nondiscriminatory reasons" for its actions. . . . The plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate "that the proffered reason was not the true reason for the employment decision."

*Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 792-93 (6th Cir. 2000). *See also Lavack v. Owen's World Wide Enterprise Network, Inc.*, 409 F.Supp.2d 848, 856 (E.D. Mich. 2005); *Pena v. Ingham Cty. Road Comm.*, 255 Mich.App. 299, 310-11 (2003).

For the reasons set forth above, Plaintiff has satisfied the first three elements for a *prima facie* retaliation claim, at least for purposes of surviving summary judgment when all evidence must be construed in his favor.  Plaintiff engaged in protected activity when he complained of discriminatory treatment by his supervisor, Parker. *See, e.g.*, *Burkhardt v. BCBSM*, 1999 WL 33455100, at *1; *Ross v. Memphis*, 394 F.Supp.2d 1024, 1034 (W.D. Tenn. 2005).  Defendant's Employee Handbook likewise protects Plaintiff's complaints, as it provides that "[a]ll harassment will be grounds for disciplinary action and could result in termination" and that the "Company will

18

not tolerate any retaliation to someone who makes a good faith complaint or cooperates in an investigation." In this case, there is a genuine issue of material fact as to whether Plaintiff's complaints were made in good faith. The protected activity was known to Defendant, as Plaintiff indisputably complained of Parker's allegedly discriminatory actions to Paterson on at least three occasions (February 23, 2005, August 3, 2005, and August 10, 2005), and to Dodd on at least two occasions (August 3, 2005, and August 10, 2005). Plaintiff suffered an adverse employment action when he was terminated on September 6, 2005. The issue for the Court is whether Plaintiff can satisfy the fourth prong of establishing a *prima facie* case, *i.e.,* is there evidence of a causal connection between the protected activity and Plaintiff's termination? For the reasons that follow, the Court concludes there is evidence in the record such that a causal connection can be inferred.

Plaintiff first raised the issue of Parker's alleged discriminatory conduct on February 23, 2005. The issue apparently lay dormant until the July 27, 2005, PIP review. At that PIP review, Plaintiff complained to Parker that he was harassing Plaintiff, Parker ended the meeting as he "saw that this was once again leading to a reiteration of old issues," and Plaintiff demanded a meeting with Dodd and Paterson (in the lexicon of Defendant company, this election to break the chain of command is called a "skip" meeting). As a result of the PIP meeting:

1.    On August 1, 2005, Parker sent an email to Paterson and Dodd regarding Plaintiff's "Mid year review and PIP (90 days)" that included the following statements (emphasis added):

> *As I stated to Kip [Paterson] on Wednesday [July 27], I do not see enough progress or movement toward the future and growth of our business to continue with Ken Eid on my sales team.* He is disruptive and consuming at my Regional meetings. I've had poor response comments made by distributors and customers to me regarding Ken's day to day activities. I've had product engineers relay issues of Ken not following up on test activity and having to force him to make calls on target accounts.
>
> This decision is difficult and I feel for Ken and his family, but for my team and Saint Gobain Abrasives *I believe it is time to allow Ken to move in another direction and us to replace him*.

2.    On August 3, 3005, Plaintiff emailed Paterson about "improper actions and statements" by Parker, including "comments related to my race and ethnic background since" Parker became his supervisor.

3.    On August 9, 2005, Parker sent an email to Paterson and Dodd about Plaintiff. The email included a four page attachment which was a summary of "issues" with Plaintiff since February 2005. The email stated, in part:

> I ask you NOT read this until you have had the chance to hear Ken out completely before hearing my side of this argument. I believe he deserves yours and Kips [sic] unbiased opinion. I will let my observations speak for themselves after your conversations.

4.    On August 10, 2005, Plaintiff spoke with Paterson and Dodd.

As noted above, Plaintiff was terminated on September 6, 2005.

The actions of Defendant, generally, and Parker, in particular, during July and August 2005 constitute evidence from which a fact finder could find a causal connection between Plaintiff's complaints and his termination. First, Plaintiff raised the issue of discrimination to Parker, one of the decision makers, on July 27, 2005, apparently for the first time since February 2005. At the same time, Plaintiff asked for a "skip" meeting with Parker's supervisor and the Human Resources director. At some point that day, Parker contacted Paterson to say that he wanted Plaintiff off of his sales team. Second, only days later, Parker sent an email to Paterson and Dodd on August 1, 2005, wherein he expressed his belief that Plaintiff should be terminated. Third, only eight days after that email, Parker "reversed" his course and said that he wanted Paterson and Dodd to make an unbiased opinion on Plaintiff after hearing Plaintiff's opinion. Despite the stated intention that Paterson and Dodd hear Plaintiff out, Parker included a four page summary of issues Parker had with Plaintiff since February 2005, which Dodd and/or Paterson could read prior to talking to Plaintiff (although Parker asked that Dodd and Paterson not read the attached summary until after hearing Plaintiff on August 10, 2005).

Fourth, despite Plaintiff's claims on the August 10, 2005, conference call with Paterson and

Dodd (the other two decision makers) that Parker had engaged in discriminatory treatment of Plaintiff, Paterson did not investigate those claims (nor is there any indication any other person at Defendant did so). Instead, Paterson expressed disappointment that Plaintiff was not more informative about such claims. Even if Plaintiff had been more informative, the record reveals that Paterson had heard the claims before (without investigating) and was aware of the persons who were present when each of the alleged comments was made. Moreover, despite Plaintiff's claims of discriminatory treatment on the conference call, Paterson sent Dodd an email only a day later (on August 11th) that said "I am going to send a response back to Ken today essentially informing him that because he did not provide the additional requested information to allow us to substantiate his complaints I am dismissing his claim as unsubstantiated." In fact, there is evidence that Paterson entirely discounted Plaintiff's complaints as he sent an email to Dodd the day of the conference call, which email said, "I also spoke with Pat [Parker] today and told him that Ken's complaint against him was not substantiated . . ."

Based on the above reasons, the Court concludes that a fact finder could determine that the described actions (or inactions) by Defendant, all of which were temporally proximate to Plaintiff's termination, were causally connected to Plaintiff's complaints of discrimination, a protected activity. Plaintiff therefore has presented a *prima facie* case of retaliation to the Court. As set forth in Section V.B.4.b. and c. above, the Court also finds that Defendant articulated a legitimate, non-discriminatory reason for Plaintiff's termination and concludes that Plaintiff has demonstrated that Defendant's proffered reasons may have been pretextual. For these reasons, the Court concludes that Plaintiff's retaliation claims in Counts, VI, VII and VIII are viable claims.

Accordingly, the Court DENIES Defendant's Motion for Summary Judgment as to Counts VI, VII and VIII.

## C. Remaining Claims

In his response brief, Plaintiff states that "Defendant has no reasonable basis for having filed

this Motion [for Summary Judgment] for Counts I-VIII," *i.e.*, the race and national origin discrimination claims, as well the retaliation claims related to race and national origin discrimination. Plaintiff does not, however, address the remaining claims which Defendant argues also are ripe for dismissal under Rule 56, including claims for breach of contract (for failing to pay Plaintiff a bonus in 2005), unjust enrichment and quantum meruit (Counts XI - XIII, respectively).

Contrary to Defendant's argument, Plaintiff's failure to respond to the motion in conformity with the requirements of Fed.R.Civ.P. 56(e) does not automatically entitle the moving party to judgment on Counts XI - XIII. Rather, Rule 56(e) provides that summary judgment shall be entered only "if appropriate." *See, e.g., Pasqueriello v. Medcentral Health Syst.*, 949 F.Supp 532, 535 (N.D. Ohio 1996). Therefore, this Court must first determine if Defendant has presented evidence to "demonstrate the absence of a genuine issue of material fact." *Celotex, supra.* The Court finds that Defendant has done so with respect to Plaintiff's claims of unjust enrichment and quantum meruit under Michigan law. There is no dispute that Plaintiff was paid his salary while he was employed by Defendant. Thus, there was no benefit received by Defendant for which Plaintiff was not paid, a necessary element to succeed on a claim of unjust enrichment or quantum meruit. *See, e.g.*, *National Concrete Constr. Assoc. v. Walbridge Aldinger Co.*, 2006 WL 3103045, at *3 (citing *Keywell and Rosenfeld v. Bithell*, 254 Mich.App. 300, 327-30 (2002) and *Allen v. McKibbin*, 5 Mich. 449, 454 (1858)). Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment as it pertains to Counts XII and XIII.

Defendant's contends that it did not breach a contract with Plaintiff because Plaintiff forfeited any 2005 bonus to which he would have been entitled. Defendant believes that Plaintiff forfeited the 2005 bonus, as a matter of law, because he was terminated during that year, and the Defendant's policy requires that an employee work the entire year in order to be eligible for a bonus. In this case, it is undisputed that Plaintiff did not work the entire year, as he was terminated on September 6, 2006. Where a plaintiff's failure to work there the entire year is the result of a wrongful discharge by the employer, however, that plaintiff would still be eligible for a bonus. *See,*

*e.g., Dumas v. Auto Club Ins. Ass'n*, 437 Mich. 521, 562-63 (1991). Accordingly, in this case, if the fact finder determines that Plaintiff was wrongfully discharged by Defendant, a genuine issue of material fact would remain as to whether Plaintiff is entitled to a 2005 bonus. Therefore, the Court DENIES Defendant's Motion for Summary Judgment as it pertains to Count XI.


## V.  CONCLUSION

Accordingly, and for the reasons set forth above, Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. All counsel and each party (or a party representative with authorization to settle this case) shall appear on January 24, 2008, at 11:00 a.m. for the Final Pretrial Conference on this case.  Counsel shall refer to the Court's Scheduling Order previously issued and comply with all requirements for the Final Pretrial Conference, including, without limitation, production of a Joint Final Pre-Trial Order and jury instructions.

IT IS SO ORDERED.

s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated: December 13, 2007